IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MICHAEL TRETHEWAY, | ) | |
| | ) | |
| Plaintiff, | ) | 8:13CV109 |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | MEMORANDUM OPINION |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on the appeal of
plaintiff, Michael Tretheway ("Tretheway"), of a final decision
by the Commissioner of the Social Security Administration ("SSA")
denying Tretheway's application for disability benefits.  The
Court finds that the Administrative Law Judge ("ALJ") erred in
assessing Dr. Zieno's opinion and will remand that matter for
further consideration.

## PROCEDURAL BACKGROUND

Tretheway filed an application for disability insurance
benefits on January 30, 2012, and alleged disability beginning
November 16, 2009 (Tr. 25).  The SSA denied that application on
February 21, 2012, and again on March 20, 2012 (*Id.*).  After the
ALJ hearing on August 8, 2012, the ALJ issued an unfavorable
opinion on August 16, 2012 (Tr. 22, 25).  The Appeals Council
then denied Tretheway's request for review on February 22, 2013

(Filing No. 1, at 2, ¶ 6).  Tretheway timely filed this appeal on
April 3, 2013 (*Id.* at 3, *see* 42 U.S.C. § 405(g)).  The Court now
reviews the ALJ's decision, which stands as the Commissioner's
final decision.

### FACTUAL BACKGROUND

Tretheway was a thirty-nine-year-old man on his onset
date with a high school diploma.  He worked in avionics and as a
mail processor (Tr. 41-42).  From July 1988 through March 1997,
Tretheway served in the Marine Corps and in Operations Desert
Shield, Desert Storm, and Eastern Exit (Tr. 502, 507, 447).
Tretheway was honorably discharged (Tr. 500).  Tretheway alleges
disability due to neuropathy in his hands, post-traumatic stress
disorder ("PTSD"), migraine headaches, and subluxation
impingement syndrome (Filing No. 13, at 2).

**Neuropathy**

In June 2010, Tretheway visited Dr. Agapito Lorenzo at
the Veterans Affairs ("VA") hospital (Tr. 530).  In that visit,
Dr. Lorenzo assessed Tretheway with depression, migraines, hyper-
tension, left shoulder pain, and bilateral weakness in the hands
and feet (Tr. 533-34).  In July 2010, Dr. Lorenzo reported that
electrophysiological studies of Tretheway's upper extremities
revealed no evidence of neuropathy (Tr. 530).  However, Dr.
Wariyar reported that the electromyography ("EMG") supported

-2-

ordering Tretheway an elbow brace (Tr. 529).  In August 2010, physical therapist Jan Nowling provided Tretheway with two tennis elbow straps after a diagnosis of bilateral lateral epicondylitis (Tr. 528, 514).  In November 2010, Tretheway stated the tennis straps aided his extensor tendinitis (Tr. 527).  He later admitted that he did not wear the straps (Tr. 514).

In February 2011, licensed practical nurse ("LPN") James McGary stated that Tretheway went to the VA with a primary complaint of tendinitis in bilateral hands.  However, when asked the severity of his pain, Tretheway responded that his pain was zero on a ten scale (Tr. 516-17).  On February 22, 2011, Tretheway returned to the VA with a complaint of bilateral arm pain (Tr. 514).  Drs. Bonnema and Schumacher confirmed Tretheway had tendinitis through an EMG reading (Tr. 514).

On February 25, 2011, Drs. Bonnema and Schumacher assessed Tretheway with bilateral hand/wrist entensor tendinitis (Tr. 510).  Specialists were unable to determine the etiology of the pain (Tr. 511).  In March 2011, Tretheway reported that playing catch with children aggravated his condition (Tr. 493).

On April 4, 2011, Tretheway's occupational therapist reviewed Tretheway's treatment after eight visits in one month (Tr. 483-85).  She stated that Tretheway was referred to her for tendinitis but that she also focused on the possibility of radial

-3-

tunnel syndrome (Tr. 484).  On April 8, 2011, Tretheway met with
Dr. Schumacker and physical therapist Lisa Gross to discuss
further treatment (Tr. 477-79).

On June 10, 2011, Drs. Schumacher and Bonnema had a
followup with Tretheway regarding his bilateral numbness and
weakness of the arms and hands (Tr. 440).  The EMG displayed no
evidence of neuropathy and labs were "unremarkable."  The doctors
scheduled Tretheway for an evaluation of his neck and thorax.

Dr. Bonnema contacted Tretheway on July 1, 2011, to
discuss his labs for his bilateral hand numbness (Tr. 431).  The
doctor stated that physical therapy evaluation and labs were not
helpful.  The doctor did not know how to proceed but would
explore the differential.

On July 6, 2011, physical therapist Gross and Dr.
Bonnema suggested that a vascular surgeon assess whether
Tretheway should undergo surgery in order to alleviate his
bilateral stress (Tr. 429).  On July 22, 2011, LPN McGary
examined Tretheway for a followup on his bilateral hand pain (Tr.
422-24).  Tretheway noted his pain was a zero on a ten scale (Tr.
422).

**PTSD**

The earliest of Tretheway's medical records from the VA
begins in 2004, prior to Tretheway's alleged onset but related to

-4-

Tretheway's PTSD (Tr. 500).  Dr. James Mathisen made the
following statements in his Compensation and Pension evaluation
("C&P").  Tretheway reported there was a mid-air collision
involving a helicopter in 1996 for which Tretheway had felt
responsible because he had inspected the helicopter.  Tretheway
said he had known the crew chief and the aerial observer but
failed to recall their names (Tr. 501).  Tretheway also reported
that in September of 1995 and March of 1997, two of his friends
committed suicide.  Dr. Mathisen stated the suicides could
vicariously meet A criteria PTSD.

Dr. Mathisen determined that Tretheway did not exhibit
intrusive memories, thoughts, or images of stressful military
experiences as related to the reported suicides.  Tretheway
dreamt bimonthly about a friend who committed suicide.  He denied
having flashbacks or reminders of suicide.  Tretheway reported
that with the nightmares he has sweating at a minimal level.
This would meet B criteria PTSD but he did not exhibit any C
criteria PTSD.  Tretheway reported that he was quite able to talk
about the suicide or other military events.

Dr. Mathisen assessed Tretheway did not have PTSD, by
any criteria, but instead had depression.  Dr. Mathisen saw no
problems with concentration or anger and stated that Tretheway
was not easily startled.  Dr. Mathisen also reported regular

-5-

activities for Tretheway (Tr. 502).  The doctor stated that
Tretheway's symptom reporting was not consistent with his
behavior, which called into question those sub-threshold PTSD
symptoms that he did report.  Also, Dr. Mathisen questioned
whether Tretheway's issues were military-connected because
Tretheway did not complain of these issues until four years after
he separated from the Marine Corps.  Dr. Mathisen attributed
Tretheway's absences from work to complications with his wife's
pregnancy and problems at the Post Office.  Dr. Mathisen believed
that Tretheway's depressive condition would have a mild impact
overall upon maintaining gainful employment.

Sometime in the beginning of 2009, Tretheway skipped
work for two months due to stress (Tr. 572).  In March 2010,
physician's assistant Brandy Reineke noted that Tretheway's
conditions led to increased absenteeism, including missing four
months within the last year (Tr. 550-51).

In March 2011, Mrs. Tretheway spoke about her husband's
condition to Drs. Babuji Gandra and Praveen Fernandes (Tr. 506).
She said Tretheway would become violent and aggressive during his
sleep, which started in 1997 after returned from Marine Corps,
but worsened in the last three years (Tr. 506).  She also
mentioned that a couple of months ago he tried to choke his son
while asleep, and the next morning he did not recall.  The

-6-

violence was not specifically related to any time or stress, but he recently began hitting the walls or running in the hallways. Tretheway denied memory of those things.

According to Tretheway, he would dream about his time in the Marine Corps and then wake up suddenly in a sweat. Tretheway was never hospitalized for his mental conditions (Tr. 507). The doctors assessed Tretheway as having violent behavior and aggression during sleep, some symptoms of PTSD. Drs. Gandra and Fernandes did not make a diagnoses of PTSD or bipolar disorder at that time.

In March 2011, Dr. Terry North noted Tretheway supplemented his list of traumas; he helped to evacuate embassy personnel from Somalia in 1992.[1] He reported that during that operation, the helicopter they were in received small arms fire and that he witnessed several people getting shot. This was the first time Tretheway mentioned this incident.

Tretheway then completed the PCL-C, PTSD Checklist, in reference to this event and he scored 64 which is above the threshold considered suggestive of a PTSD diagnosis (Tr. 503). Also, Tretheway recalled dreaming of trying to help others escape a dangerous situation and also trying to escape a dangerous

---

[1] Operation Eastern Exit occurred in January 1991 (Tr. 447).

situation.  Tretheway stated that he thought about this situation almost every day, along with the other stressful, traumatic events, and that he avoided thinking and talking about this event.  Due to the incident in Somalia, which Tretheway had never before mentioned, Dr. North believed that Tretheway met the criteria for a PTSD diagnosis and review of the veteran's responses to the PCL-C.  Tretheway's PTSD treatment included admittance to the PTSD Treatment Program, medication, and counseling (Tr. 498).

Tretheway attended PTSD therapy regularly from March 2011 through his diagnosis in February 2012 (Tr. 369, 376, 378-81, 391, 417, 425-27, 429, 432, 434, 440-42, 460, 462, 474, 480-82, 488, 496).  On August 8, 2011, Tretheway mentioned he began repairing bicycles in the neighborhood (Tr. 415).  On August 18, 2011, during PTSD treatment, Tretheway expressed anger at his psychiatrist for the exposure therapy in his last session (Tr. 383).  On August 30, 2011, Tretheway missed his psychiatric appointment (Tr. 382).  Drs. Angelo Zieno and Fernandes wrote that they did not perform exposure therapy, but offered it as a suggestion for the future (Tr. 382).

On October 20, 2011, Tretheway announced to his PTSD Treatment group that he gained 100% unemployability from the VA (Tr. 374).  On November 10, 2010, Tretheway moved to his new home

-8-

and attended PTSD treatment (Tr. 372).  That day, Dr. Willcockson suggested a diagnosis of PTSD for Tretheway (Tr. 370-71).

On February 3, 2012, Tretheway announced that he was on the Dean's List for last semester's grades and considered pursuing SSDI (Tr. 368).  On March 2, 2012, Tretheway told his class that his wife was encouraging him to quit school in order to qualify for SSDI (Tr. 630).  The group and Dr. Willcockson discouraged such advice.  On May 11, 2012, Tretheway again mentioned his wife's financial interest in his social security benefits.  Dr. Willcockson wrote the following entry:

> He says that he has an SSDI hearing on June 5 and his wife is pressuring him that this rating is necessary in order that she not have to work.

(Tr. 722).

**Migraines**

In February 2009, Tretheway complained of migraine headaches, left shoulder pain, depression, and unspecified joint pain (Tr. 581-82).  The doctor prescribed a six-pill package of Zolmitriptan with 12 refills to help Tretheway's migraines (Tr. 581).  This medication is taken at the on-set of migraine headaches and abates the symptoms.

In May 2009, Tretheway reported that the Zolmitriptan helped his weekly migraines (Tr. 554, 563, 574-78).  Tretheway's

-9-

migraine medication expired in February of 2010 and he had refilled his prescription only once (Tr. 554, 557, 563, 574-78). Therefore, Tretheway possessed no more than twelve pills in a twelve-month period.  If Tretheway had taken his prescription every time he had a migraine, he could not have had more than twelve migraines in that year.  A year after his prescription expired, in February 2011, Drs. Rachel Bonnema and Abram Schumacher noted that Zolmitriptan aided Tretheway's migraine pain (Tr. 516).

In 2012, Tretheway completed several diagnostic documents prior to his hearing.  In these forms, Tretheway stated that he no longer used Zolmitriptan (Tr. 202-14).  Specifically regarding his migraines, Tretheway claimed Zolmitriptan did not help his migraines (Tr. 215).  Yet, on July 2012, a month before his ALJ hearing, Tretheway went to the VA and requested a refill of Zolmitriptan (Tr. 709).  Tretheway said it worked very well for his migraines but he had failed to renew the prescription and it expired (Tr. 709).  In fact, Tretheway stated that he had not had migraine medication "for several years" (Tr. 716).

**Subluxation**

While in the military, Tretheway was playing a game of softball, slid into a base, and dislocated his shoulder.  In April 20, 2011, Dr. Judson Jones performed a medical evaluation

to determine the motion ranges of Tretheway's joints by use of a goniometer (Tr. 465).  Tretheway stated he had no standing or walking limitations (Tr. 466).  Dr. Jones assessed Tretheway's range of motion in his left shoulder was as follows:

> Forward elevation:  0° -- 115° with tenderness beginning at 90°;
> Abduction:          0° -- 95° with tenderness beginning at 90°;
> External rotation:  0° -- 70° with tenderness beginning at 55°;
> Internal rotation:  0° -- 75° with tenderness beginning at 60°.

(Tr. 467).  The doctor stated that the effect of Tretheway's left shoulder condition would significantly affect a usual occupation and that condition would impact Tretheway's ability to lift, carry, and reach (Tr. 468).  Dr. Jones also assessed the effects of the condition on daily activities (Tr. 468).

**Examinations**

In August 10, 2011, Tretheway received a C&P consult (Tr. 392-402).  Staff physician Isaac Witkowski noted that Tretheway's pain, weakness, and stiffness occurred daily.  Flare-ups occurred with movement, activity, and yard work; could last up to a few days; and functional impairment occurred because he avoided some activities.  Tretheway said he can walk a few blocks and sit and stand for about 20 minutes but played no sports.

-11-

Tretheway also had occasional difficulty bathing but accomplished routine chores without difficulty.

Dr. Witkowski assessed that Tretheway grasped with equal and good muscle strength and had sensation in both upper extremities.  Dr. Witkowski stated the headaches are likely to interfere with sedentary employment and that the shoulder issue is less likely to interfere with any sedentary employment, if the joint is not used (Tr. 402).  On February 16, 2012, Dr. Christopher Milne assessed Tretheway's mental residual functional capacity ("RFC") (Tr. 592-610).  On February 17, 2012, Dr. Steven Higgins assessed Tretheway's RFC (Tr. 614-19).

In a Vocational Rehabilitation program survey on October 10, 2010, Tertheway made the following assertions.  He could do some physical work (Tr. 315).  He could work a full-time job (Tr. 315).  He did not miss work more than an average employee (Tr. 315).  His disabilities could worsen (Tr. 318).  He required some special working conditions (Tr. 319).  His disability limited some work (Tr. 320).  Getting along with people at work is always easy (Tr. 320).  He had a pleasing personality (Tr. 321).  On a scale from one to seven, Tretheway marked he was moderately disabled, a three (Tr. 321).

Academically, Tretheway held good standing at Metropolitan Community College ("MCC") from 2010-2011 (Tr. 262).

-12-

In a counseling session, rehabilitation counselor Candice Watson advised Tretheway to pursue a business track because it was a less demanding career field (Tr. 267).  On October 13, 2010, counselor Watson had noted that Tretheway did not have a serious employment handicap (Tr. 315).  On October 12, 2011, Tretheway asked Counselor Watson to hold off on giving job referrals because his service connected disability had increased (Tr. 270).

## ADMINISTRATIVE HEARING

On August 8, 2012, the ALJ held a hearing.  Tretheway began studying at MCC in May 2011 (Tr. 48).  He estimated that he failed three of his courses (Tr. 49).  In addition, Tretheway stated that he was doing poorly in the current quarter (Tr. 49).  Tretheway was a mail processor but lost his job for failing to attend work two or three times per week over a period of two years (Tr. 52).  Tretheway stated that his migraines and anxiety kept him from working (Tr. 52).

Tretheway named Drs. Weber and Zieno as his medical doctor and psychiatrist respectively (Tr. 53).  Tretheway never attended solo counseling but attended the PTSD group counseling sessions (Tr. 53-54).  He missed sessions due to school activities, appointments, or transportation issues (Tr. 54).

In severity of pain, Tretheway listed his hands, neck, head, feet, and calves (Tr. 56).  Tretheway stated his hands were

-13-

in pain constantly and progressively worsened through the day
(Tr. 56).  Migraines caused the pain in Tretheway's neck and head
and they occurred two or three times a week (Tr. 57).

       Tretheway's daily activities were caring for the
children, preparing meals, cleaning the house, loading the
dishwasher, and watching TV (Tr. 58-59).  Tretheway also drove
and went grocery shopping but he did not clean the bathrooms,
dust, or walk his dogs (Tr. 60).  Tretheway was capable of self-
care activities (Tr. 61).  Tretheway attended church once
bimonthly and recently took the family on a vacation to Oceans of
Fun and Worlds of Fun in Kansas City (Tr. 60-61).  Tretheway
occasionally went to the movies with his wife and visited family
regularly (Tr. 62-63).

       Then, Tretheway's attorney examined him.  Tretheway
testified that he failed three classes because he had difficulty
concentrating for longer than 25 minutes (Tr. 64).  He once was
on the Dean's List of academic achievement but had been placed on
academic probation by the VA for his recent failures (Tr. 65).
Traveling to the campus for classes was difficult for Tretheway
because of his PTSD (Tr. 66).  Tretheway would type on the
computer approximately 40 minutes and then let his hands rest for
a couple of hours.  He also experienced difficulty manipulating
items.  Tretheway testified that he could lift 30 to 40 pounds.

-14-

After numerous examinations, the VA had not identified the cause for this condition (Tr. 67-68).

Tretheway discussed his PTSD.  He described his anxiety, anger issues, and his night terrors (Tr. 69-70).  He also explained that the VA never recommended that he see a therapist one-on-one (Tr. 70).  Tretheway testified that he did not believe that he could work because he could not stand or sit for long periods or lift objects (Tr. 72).

The ALJ then examined the Vocational Expert ("VE"), Steven Schill.  First, the ALJ asked whether a hypothetical person with several limitations could perform the work which Tretheway once performed (Tr. 72).  The ALJ described this hypothetical person as sharing Tretheway's age, education, and work history, who would work best in a situation with minimal contact with others and no contact with the general public. Furthermore, the ALJ limited the hypothetical person's physical abilities by saying that person could perform only light work; cannot do continuous push-pull with the upper extremities bilaterally; cannot do frequent push-pull with the left upper extremity; should never climb or reach up or back with his upper left extremity; may frequently balance, stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to extreme cold, noise, vibrations, and hazards (Tr. 74-75).  With those

-15-

limitations in mind, the VE said that such a person could not perform Tretheway's previous work (Tr. 75).

Second, the ALJ asked the VE what sort of work such a hypothetical person might perform (Tr. 75).  The VE replied light, unskilled positions such as an office helper,[2] photocopy machine operator,[3] and a cafeteria assistant.[4]

Then, Tretheway's attorney examined the VE.  First, Tretheway's attorney used a hypothetical person with the same age as Tretheway, with a high school education, some college, and the following limitations:  unable to stand for longer than 10 to 15 minutes before needing to sit down; unlikely the person could stand for six hours out of an eight-hour day; difficult for them to perform jobs that involve significant amounts of handling, grasping and feeling (Tr. 75).  Tretheway's attorney asked what sort of sedentary work such a person could perform (Tr. 75-76). The VE responded that such a person could not work (Tr. 76).

Second, Tretheway's attorney created a second hypothetical person who simply missed work three days a month on

---

[2]  Dictionary of Occupational Titles ("DOT") code 239.567-010; 695 Iowa, Nebraska, Kansas, and Missouri ("regional") jobs; 23,000 national ("US") jobs.

[3]  DOT code 207.685-014; 900 regional jobs; 19,700 US jobs.

[4]  DOT code 311.677-010; 2,100 regional jobs; 86,000 US jobs.

-16-

account of migraines.  When asked if such a hypothetical person could sustain a job, the VE answered no (Tr. 76).

Third, Tretheway's attorney asked whether his first hypothetical individual would be able to perform any of the three light, unskilled jobs the VE previously mentioned (Tr. 77-78). The VE answered no (Tr. 78).

### THE ALJ'S FINDINGS

The ALJ found that Tretheway had not engaged in substantial gainful employment since November 16, 2009 (Tr. 27). The ALJ concluded Tretheway had the following severe impairments: neuropathy, not otherwise specified, PTSD, migraine headaches, and subluxation impingement of the left shoulder (*Id.*).  She did not conclude, however, that Tretheway had an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 28).  The ALJ went on to ascribe Tretheway's RFC (Tr. 29). The ALJ determined that Tretheway could perform "light work" except the following limitations:

> the claimant is limited to lifting
> 20 pounds occasionally and 10
> pounds frequently but is limited
> from continuous pushing or pulling
> with the upper extremities
> bilaterally and frequently pushing
> or pulling with the lower
> extremities.  The claimant can
> frequently climb, balance, stoop,

-17-

kneel, crouch, and crawl, but
should avoid climbing ladders,
ropes, or scaffolds.  The claimant
can reach, handle, finger, and
feel, but should avoid reaching up
and backwards with the left upper
extremity.  The claimant should
avoid extreme and concentrated
exposure to cold, noise, hazards,
and vibrations.  The claimant can
understand, remember, and carry out
simple instructions under ordinary
supervision.  The claimant has
adequate attention and concent-
ration to perform tasks. He would
work best in situations with
minimal contact with supervisors
and coworkers and should avoid all
contact with the general public.

(Tr. 29).  The ALJ explained her decision for this RFC over the

next four pages (Tr. 29-33).  After careful consideration of the

evidence, the ALJ found the Tretheway's statements concerning the

intensity, persistence, and limiting effects of those symptoms

were not credible to the extent they were inconsistent with the

RFC.  In light of those considerations, the ALJ found that

Tretheway was not fully credible and the evidence as a whole

supported the RFC (Tr. 33).  Consequently, the ALJ found that

Tretheway was able to perform light, unskilled work (Tr. 33-34).

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits,

the district court's role under 42 U.S.C. § 405(g) is limited to

determining whether substantial evidence in the record as a whole

-18-

supports the Commissioner's decision.  *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995)*.*  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  *Juszczyk v. Astrue*, 542 F.3d 626, 631 (8th Cir. 2008).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.  *Id.* (quotations and citations omitted). Thus, the Court will uphold the Commissioner's final decision "if it is supported by substantial evidence on the record as a whole."  *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).

### LAW & ANALYSIS

In his primary brief to this Court, Tretheway asserts four errors to the ALJ's decision:  the ALJ erred when she failed to give proper consideration to the underlying VA medical evidence; the ALJ's credibility determination was not supported by substantial evidence; the ALJ's RFC was not supported by substantial evidence; and, the ALJ's hypothetical RFC question failed to reflect Tretheway's limitations (Filing No. 13, at i-ii).

### I. Consideration to the underlying VA medical evidence.

Tretheway contends that the ALJ insufficiently addressed the VA's explanation for the ratings and the C&P

examinations (Filing No. 13, at 9).  Also, Tretheway argues that the ALJ violated SSA regulations by not weighing the medical opinions in the VA's rating.  *Id.* at 11.  Further, Tretheway faults the ALJ for not providing explanation why the VA erred in its determination of Tretheway's disability under the VA's regulations.  *Id.* at 12.  These assertions fail because the ALJ sufficiently reviewed the VA's ratings and underlying medical evidence.

Although a disability rating by the VA is not binding on the ALJ, it is "entitled to some weight and must be considered in the ALJ's decision."  *See Hamel v. Astrue*, 620 F. Supp. 2d 1002, 1025 (D. Neb. 2009).  If the ALJ rejects the VA's finding of disability, "reasons should be given to enable a reasoned review by the courts."  *Id.*  The Eighth Circuit announced that an ALJ errs when she gives no reason for rejecting a VA rating.  *See Morison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998).  However, an ALJ does not err when she addresses the VA rating and discusses "the underlying medical evidence contained in the VA's Rating Decision."  *Pelkey v. Barnhart*, 433 F.3d 575, 579-80 (8th Cir. 2006).

Here, the ALJ addressed the VA rating and examined its underlying evidence at great length, including the examinations of VA doctors.  Tr. 27-34.  Also, the Eighth Circuit does not

require ALJs to square VA ratings with SSA decisions; instead, it requires that ALJs give reasons for rejecting the VA's determinations.  The ALJ in this case gave such reasoning, and, therefore, did not err.  *See Pelkey*, 433 F.3d at 579-80.

## II. Credibility determination.

Tretheway contends that the ALJ erred in her assessment of Tretheway's credibility (Filing No. 13, at 22).  Tretheway asserts that the ALJ considered only some, but not all, of Tretheway's testimony when making her assessment.  *Id.* at 23.

In making an RFC determination, the ALJ is required to consider the "claimant's own descriptions of his limitations" unless the ALJ makes a proper credibility determination and finds that the claimant's statements regarding his own pain are not credible.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217–18 (8th Cir. 2001).  To make such a finding, an ALJ must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to:  (1) claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions.  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.

1986).  The absence of an objective medical basis which supports
the degree of severity of subjective complaints alleged is one
factor in evaluating the credibility of the testimony and
complaints.  *Id.*  Subjective complaints may be discounted if
there are inconsistencies in the evidence as a whole.  *Id.*

Consequently, an ALJ is required to make an "express
credibility determination" when discrediting a social security
claimant's subjective complaints.  *Lowe v. Apfel*, 226 F.3d 969,
971–72 (8th Cir. 2000).  The ALJ, however, is "not required to
discuss methodically each *Polaski* consideration."  *Id.* at 972.
Deference is generally granted to an ALJ's determination
regarding the credibility of a claimant's testimony.  *Dunahoo v.
Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an
ALJ provides a "good reason" for discrediting claimant's
credibility, deference is given to the ALJ's opinion, "even if
every factor is not discussed in depth.").  Here, the ALJ
expressly determined Tretheway's statements concerning the
intensity, persistence, and limiting effects of his symptoms was
not credible above his RFC.  The reasons for this determination
included lack of objective medical evidence, and Tretheway's
failure to abide by his treatments, and inconsistencies with the
record as a whole.

-22-

In regards to migraines, the ALJ discussed Tretheway's treatment and lack thereof.  Though it is true that Tretheway was prescribed medication on August 8, 2012, the time of the hearing, the record clearly shows that Tretheway barely used his prescribed medication.  In February 2009, a VA doctor prescribed a six-pill package of Zolmitriptan with twelve refills for Tretheway's migraines.  Tr. 581.  However, Tretheway only refilled his prescription once in the course of that year, meaning that he used no more than twelve pills in that one year.  Tr. 557.  In February 2010, his prescription expired.  Tr. 565, 576, 557, 215, 516, 706.  Nonetheless, Tretheway told his treating doctors that the medication was effective for treating his migraines even after his migraines became more frequent and the prescription ended.  Tr. 516, 706.  Years later, on February 2, 2012, Tretheway stated that he was not taking migraine medication and the migraine medication he had taken, Zolmitriptan, did not help.  Tr. 216.  Then in July, 2012 -- one month before appearing before the ALJ -- Tretheway returned to the VA to renew his prescription.  Tr. 709.  Tretheway said Zolmitriptan "worked very well" for him but that his other conditions prevented his refilling the prescription for two years.  Tr. 709.  The evidence as a whole contradicts Tretheway's

assertions regarding the frequency, duration, and intensity of
his migraines.

In regards to neuropathy, the ALJ cited the lack of
objective medical evidence of this condition, inconsistences in
the record, and daily activities to support her decision.  After
several tests, there were no specific causes for the neuropathy.
Also, the record reflects that neuropathy was never presented in
an EMG.  Tr. 440.  Tretheway reported that his tendinitis caused
constant pain, yet in his visits to the VA hospital, he noted his
pain was a zero out of ten.  Tr. 422, 516-17.  Tretheway stated
that the tennis straps aided his condition but later stated that
he stopped using the tennis straps.  Tr. 214, 527.  Tretheway
performed numerous daily activities with use of his hands,
including driving, grocery shopping, played catch, carrying
books, household chores, fixing bicycles, manipulating computers
and writing tools.  Tr. 392-402, 415, 493.  The evidence as a
whole contradicts Tretheway's assertions regarding the frequency,
duration, and intensity of his neuropathy.

Similarly, Tretheway's assertion regarding his foot
pain was inconsistent with the record.  In April 2011, Tretheway
stated he had no standing or walking limitations.  Tr. 466.  Less
than four months later, in August 2011, Tretheway claimed he
could not stand for more than twenty minutes.  Tr. 420.  There

-24-

was no diagnostic data to support Tretheway's standing limitation.  Tr. 31.

In regards to Tretheway's PTSD, the ALJ noted inconsistences in the record and Tretheway's daily activities. In 2004, Dr. Matheson questioned Tretheway's symptom reporting and the fact that Tretheway could not recall the name of his two close friends who committed suicide.  Tr. 502.  The doctor also noted that Tretheway was quite willing to discuss his stressful military events, yet Tretheway did not discuss Operation Eastern Exit until seven years later.  Tr. 501, 507.  Dr. Matheson also discussed Tretheway's daily activities.  Tretheway drove, shopped, household chores, cared for his children, attended church once every couple of months, took family vacations, went to the movies, successfully attended school up until he applied for Social Security benefits, and visited family.  Tr. 60-63. The evidence as a whole contradicts Tretheway's assertions regarding the frequency, duration, and intensity of his PTSD.

**III. The ALJ's RFC was not supported by substantial evidence.**

Tretheway contends the ALJ erred in the following manners: giving improper weight to the opinion of Dr. Weber, giving improper weight to the opinion of the Dr. Zieno, finding Tretheway has no manipulation limitations.  Filing No. 13, at 12.

**A.   Opinion of Dr. Weber.**

Dr. Weber, Tretheway's treating physician, delivered a letter to the ALJ regarding Tretheway's conditions.  Tr. 697. Dr. Weber relayed Tretheway's subjective statements of pain.  *Id.* ("Tretheway states he is unable to stand for a period longer than 10-15 minutes due to the severe pain in his feet . . . [and he] complain[s] of migraine headaches that occur 2-3 days per week and require him to miss work.").  Dr. Weber informed the ALJ that, after an exhaustive medical work-up trying to diagnose Tretheway's pain in his hands and feet, the most accurate diagnosis was neuropathy NOS.  *Id.*  Dr. Weber said he was not successful in treating Tretheway's condition or diagnosing it.

Due to Tretheway's statements of pain in his legs, Dr. Weber opined that Tretheway would be unable to stand for more than 10-15 minutes before sitting.  Due to Tretheway's statements of pain and numbness in his hands, Dr. Weber stated Tretheway would have difficulty handling, grasping, and feeling objects. Due to Tretheway's migraine claims, Dr. Weber stated he would miss a significant amount of work, approximately three days per week.

The ALJ declined to give much weight to Dr. Weber's opinions because they relied upon the alleged "neuropathy" for which there is no specific diagnosis.  Also, the treating doctors

-26-

and neurologists were unable to specify an underlying cause of the "neuropathy" or any further insights.  Tr. 32.

"Generally, [a] treating physician's opinion is due controlling weight if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (citing *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001)) (alteration in original) (internal quotation omitted).  However, "[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  *Id.* (citing *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (internal quotation omitted).

Here, the ALJ properly discounted Dr. Weber's opinion because it was internally inconsistent.  In his letter, Dr. Weber states that he was unsuccessful in diagnosing Tretheway, but neuropathy was the "most accurate" diagnosis for Tretheway's complaints.  Tr. 697.  Dr. Weber and Tretheway's neurological teams based their medical opinions on Tretheway's complaints because no objective medical evidence supported Tretheway's underlying condition.  *Id.*  Nonetheless, unable to diagnose

-27-

Tretheway's condition or support his claim with objective medical evidence, Dr. Weber gave a prognosis which conflicted with the record as a whole. *See supra* 22-23. Therefore, the ALJ did not err in granting doctors who depended upon the unsuccessful diagnosis, like Dr. Weber, less deference.

**B.    Opinion of Dr. Zieno.**

Dr. Zieno, Tretheway's "treating psychologist" who examined Tretheway only twice, completed most of a Mental Impairment Questionnaire and submitted it to the ALJ. Tr. 647-653. Dr. Zieno opined Tretheway would miss at least three days of work per month and would be unable to maintain regular attendance. The ALJ did not give much weight to those opinions because Dr. Zieno gave a "moderate" Global Assessment Function ("GAF") score. The Court finds that this GAF score is not internally inconsistent with the doctor's opinion. On remand, the ALJ must reconsider whether to give weight to Dr. Zieno's report on factors above and beyond a mere GAF score. *See Duncan v. Barnhart*, 368 F.3d 820, 823-24 (8th Cir. 2004). These factors should include the treatment relationship, consistency, specialization, the thoroughness of Dr. Zieno's assessment, and other things. If the ALJ determines Dr. Zieno's opinion deserves consideration, the ALJ must likewise redetermine how much weight the opinion deserves and the corresponding RFC.

-28-

**C. Manipulation limitations**

The substantial weight of the evidence supports the ALJ's RFC concerning Tretheway's limitations in his hands, arms, feet, shoulder, and legs.  *See supra* 19-24, 25-27.

**IV. Hypothetical RFC question.**

The ALJ erred in evaluating whether Dr. Zieno's opinion deserved consideration and to what extent.  Therefore, the Court will not evaluate the ALJ's hypothetical questions dependant upon the ALJ's reevaluation.

**CONCLUSION**

The substantial evidence in the record as a whole illustrates that the ALJ did not improperly discount Tretheway's subjective claims of the persistency and severity of pain.  The ALJ's examination of Tretheway's daily activities was a necessary and proper factor in determining the credibility of Tretheway's subjective complaints.  Furthermore, numerous other considerations in the record as a whole support the ALJ's conclusion pursuant to *Polaski*.  The Court will, however, remand the matter to the ALJ to reassess the analysis of Dr. Zieno's opinion pursuant to this order.  The ALJ did not err in her assessment of Tretheway's manipulation limitations.  The Court makes no ruling as to the RFC hypothetical questions in the

-29-

hearing.  A separate order will be entered in accordance with this memorandum opinion.

DATED this 4th day of March, 2014.

BY THE COURT:

/s/ Lyle E. Strom

_____
LYLE E. STROM, Senior Judge
United States District Court